

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
                             :

LISA KELLY,                :  08 Civ. ____

                  Plaintiff,     :

        -against-           :   **COMPLAINT**

CANTOR FITZGERALD & CO. and    :  PLAINTIFF DEMANDS
CANTOR FITZGERALD SECURITIES,   :  <u>TRIAL BY JURY</u>
                             :

              Defendants.  :

------------------------------------------------ x

       Plaintiff, Lisa Kelly, by her attorneys, Liddle & Robinson, L.L.P., for her complaint alleges as follows:

<h3 style="text-align:center">THE PARTIES</h3>

       1.  Ms. Kelly is a female over the age of 40.  Her date of birth is October 24, 1964.  She resides at 5 Packard Drive, Middletown, New Jersey 07748.  Ms. Kelly was employed by defendant, Cantor Fitzgerald Securities from September 29, 2003 until October 2006 and by defendant, Cantor Fitzgerald & Co. from October 2006 until September 20, 2007.  At all relevant times, Ms. Kelly worked for defendants (collectively "Cantor") in New York, New York.

       2.  Upon information and belief, Cantor Fitzgerald & Co. is a corporation organized and existing under the laws of New York, and Cantor Fitzgerald Securities is a New York general partnership.  Each entity has its principal place of business at 110 East 59th Street, New York, New York 10022.

## THE NATURE OF THE ACTION

3.   This is a civil action for damages and remedies brought under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.[1]

## JURISDICTION AND VENUE

4.   Jurisdiction is founded upon 28 U.S.C. § 1332.

5.   The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.   Ms. Kelly served copies of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel prior to filing it in the United States District Court.

7.   Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Ms. Kelly's claims occurred in the Southern District of New York.

---

[1] Ms. Kelly has filed two Charges of Discrimination with the Equal Employment Opportunity Commission asserting claims of sex, age, race and national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq. ("Title VII") and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"). Upon receipt of a Notice of Right to Sue, Ms. Kelly intends to amend this Complaint to include those claims.

## FACTS

8. Ms. Kelly began her career in the financial services industry nearly 26 years ago at age 17.

9. Ms. Kelly joined Cantor on September 29, 2003 as Vice President and Salesperson on the Fixed Income Repurchase ("Repo") desk within Cantor's Debt Capital Markets ("DCM") division. Ms. Kelly was the first salesperson hired to assist in building Cantor's Repo business. She brought with her to Cantor a large book of established Repo business.

10. Throughout her employment with Cantor, Ms. Kelly was qualified for her position and performed her duties in a professional and competent manner.

11. For the years 2003 and 2004, Ms. Kelly was ranked number one in sales production. During 2005 and most of 2006, she remained ranked number two in overall sales production, and number one within Cantor's mortgage tri-party liquidity business.

12. Until mid-2005, all of Ms. Kelly's colleagues on the Repo desk were male.

13. From the outset of Ms. Kelly's employment, the male professionals on the Repo desk created a hostile work environment by, among other things, viewing pornographic material on the internet and the trading floor, sending and discussing sexually explicit e-mails, making lewd comments about women and grabbing their own genitalia. When Ms. Kelly

complained to these individuals, she was told to "get a life" and advised "don't look." On one occasion, she was asked "why did we have to hire you, anyway?"

14. Jeff Kidwell became Ms. Kelly's supervisor in March 2004. He told Ms. Kelly that Irv Goldman, President and CEO of DCM, had nothing but great things to say about her work and experience, and he told her how impressed he was with her business and how thrilled he was to have her on his team.

15. The following month, Tom Sapio was hired to co-head the Repo desk with Mr. Kidwell. Mr. Sapio also expressed to Ms. Kelly that Cantor held her in high regard and that he was impressed with her client base.

16. Shortly after his hire, Mr. Kidwell moved Ms. Kelly's seat to a coveted spot in the middle of the Repo trading desk, stating that "your experience and account base deserve front and center."

17. Also in March 2004, Ms. Kelly was asked to become a recruiting member of Cantor's MBA Associate Training Program. Shortly thereafter, Mr. Goldman approved her to be a mentor to the young women in Cantor's MBA program. After she created and organized what was to be the First Annual Women's MBA Associates Dinner within DCM, Ms. Kelly was given permission to make the dinner an annual event.

18. At the end of 2004, Ms. Kelly received partnership shares as part of her compensation package. She was told that the receipt of partnership shares was an exclusive opportunity and had been made in recognition of her talent, contributions and dedication.

19. At that time, Ms. Kelly requested to be considered for a promotion to Senior Vice President. Mr. Sapio said that he would recommend her for such promotion.

20. In January 2005, after yet another incident in which her male colleagues refused to stop the continuous viewing of pornographic material in her presence, Ms. Kelly complained to Mr. Sapio and detailed for him the behavior that had been creating a hostile work environment on the trading desk since her arrival. Mr. Sapio thanked her for coming to him and assured her that she would not be retaliated against for her complaints.

21. After a few weeks, Ms. Kelly followed up with Mr. Sapio, who said that he had taken care of the problem and asked her to let him know if it happened again. Ms. Kelly told him that it had never stopped happening, to which he responded "I told you I took care of it." When Ms. Kelly suggested that she should bring her complaints to Human Resources, Mr. Sapio became annoyed and repeated that he would "take care of it," and strongly suggested that Ms. Kelly not go to Human Resources.

22. In or around February 2005, Messrs. Kidwell and Sapio decided to focus Ms. Kelly's business solely on securities lending, despite the fact that she was experienced in every Repo product. Ms. Kelly expressed concern that this decision would limit her growth and

opportunity for advancement, as well as her compensation. No reason was given to Ms. Kelly for this decision other than "management feels it is best." None of Ms. Kelly's male colleagues were required to limit their business in this manner.

23. Also in or around February 2005, Mr. Kidwell took over Ms. Kelly's responsibilities concerning the Portfolio Trade program, a project that she had begun to institute with former management prior to Mr. Kidwell's hire.

24. In or around March 2005, Ms. Kelly learned that promotions had been granted to two of her male colleagues, while she had not been promoted. Mr. Sapio had previously informed her that no one on the Repo desk would receive a promotion because the desk had suffered large losses in 2004.

25. Also in or around March 2005, when Cantor's office relocated, Ms. Kelly's seat on the trading desk was moved from the middle of the desk to the farthest end, thereby isolating her from her male colleagues. When she raised concern about the change, Mr. Sapio snapped that Ms. Kelly was "not being a team player" and was "becoming a noisemaker."

26. Shortly thereafter, Mr. Kidwell removed Ms. Kelly from the MBA recruiting team. Ms. Kelly also failed to receive prior expense approval for what would have been the Second Annual Women's MBA Associates dinner.

27. In or around August 2005, Mr. Kidwell unjusitifiably accused Ms. Kelly of having "communication problems." Ms. Kelly also began to see that her work was being more closely scrutinized by management than that of her male colleagues, and that she was becoming subject to a series of petty and unjustified complaints. Additionally, Ms. Kelly was labeled "pushy" and "rude" in situations in which the men were described as "driven" and "aggressive."

28. Also in or around August 2005, Ms. Kelly requested access to mortgage broker screens to which her male colleagues had access, in order to properly perform her job. That request was denied with no other reason given than "management wants it this way."

29. In mid-2005, two women were hired to the Repo desk. One, Elizabeth Biddle, was 25 years old and the other, Staci Turner, was 30 years old.

30. In October 2005, Cantor held its annual golf outing, at which 85 percent of Ms. Kelly's clients were in attendance. Management had decided that Ms. Biddle, Ms. Turner and Ms. Kelly would stay behind at the resort while the men golfed with the clients. Since Ms. Kelly does not golf, she did not protest. At the last minute, Mr. Kidwell asked Ms. Biddle and Ms. Turner to accompany Ms. Kelly's clients – even after they protested that they were not properly dressed – and instructed Ms. Kelly to stay behind when she suggested that they all go. Mr. Kidwell made clear that he had done so because he believed that the clients – most of whom were male – would prefer spending time with the younger women, whom he described as "perky."

31. In November 2005, Ms. Kelly met with Mr. Goldman, President and CEO of DCM, to discuss the above-described treatment. Mr. Goldman claimed to have no knowledge of any of the events causing Ms. Kelly concern and suggested that she speak with Mr. Sapio. Ms. Kelly did so and was assured by Mr. Sapio that he would do something to resolve the situation. He did not. Instead, Ms. Kelly's working environment became even more intolerable.

32. Most notably, Mr. Kidwell began calling several of Ms. Kelly's customers to ask about her performance and requesting that they report back to him concerning her communications with them. These actions caused discomfort among Ms. Kelly's clients and interfered with her long-standing relationships. Upon information and belief, Mr. Kidwell did not contact the clients of Ms. Kelly's male colleagues seeking such feedback. Although Mr. Sapio said that he would resolve this issue as well, he did not.

33. In February 2006, several of Ms. Kelly's accounts were transferred to Ms. Biddle and Ms. Turner. The only explanation provided to Ms. Kelly was that her book of business was "too big" and management thus felt "it is best" to reassign some of her accounts. Ironically, management described Ms. Kelly's portfolio as "too big" only when accounts were taken away from her – otherwise, in the context of discussing Ms. Kelly's contributions to the firm or her compensation, her portfolio was described as "worthless."

34. Throughout 2005 and 2006, Ms. Kelly's male colleagues received client leads that were far superior to the leads that Ms. Kelly received, in that many of her leads were for

accounts that did not trade Repo products or had issues with the fact that Cantor was not a rated entity or primary dealer.

35. In February 2006, Ms. Kelly was informed of her compensation package for 2005. Unlike for 2004, she was awarded no partnership shares. Additionally, although Ms. Kelly's production was multiples of that of many of her male colleagues, upon information and belief, the males received higher compensation for 2005 than did Ms. Kelly. Ms. Kelly thus complained to management that she felt she was being treated less favorably than her male colleagues and not given the same opportunities for growth and advancement.

36. Although six men on the Repo desk were promoted in 2006, Ms. Kelly once again failed to receive a promotion. When she questioned this decision, Mr. Sapio told her that it was unlikely she would ever be granted a higher title given the nature of the securities lending sector of the market she had been limited to covering. Ms. Kelly again complained that she was not being given the same opportunities for growth and advancement as were her male colleagues.

37. In early May 2006, Ms. Kelly complained to Mr. Sapio and Jason Rok, Managing Director of Repo sales and trading, that the male traders – including Mr. Rok – continued to subject her to hostile and derogatory comments. Additionally, they had begun to routinely provide bids and offers for Ms. Kelly's customers that were not as competitive as those provided to the customers of her male and younger female colleagues. This behavior threatened Ms. Kelly's flow of business and her relationships with her accounts. Mr. Sapio told Ms. Kelly that he would address the issue, yet he did not.

38. Immediately thereafter, Mr. Rok began his own campaign of petty and unjustified complaints about Ms. Kelly's performance, berating her for making non-existent errors, and going so far as to give her a verbal tutorial on how to perform her job and sending her a follow-up e-mail tutorial. He also complained that Ms. Kelly had left the office one day at 4:50 p.m. (as was routine for her and her male colleagues) before a wire transfer had arrived, when it is standard practice to transfer responsibility for late-day wire transfers (which can arrive as late as 6:00 p.m.) to the operations and wire departments. When Ms. Kelly informed Mr. Rok that she had followed procedure and told the appropriate people to expect the wire before leaving, he responded "I don't really give a shit what you have to say."

39. At the same time, Ms. Kelly was baselessly accused by Mr. Kidwell – for the first time – of having "perception problems," as well as an inability to establish successful communication with the trading desk.

40. Management's openly hostile and retaliatory behavior towards Ms. Kelly sent a message to others on the trading desk that they could treat her in the same manner with impunity. For example, one of Ms. Kelly's male co-workers, Jeff Miller, whom she had trained and who had since been promoted several times, most recently to Senior Vice President, recorded Ms. Kelly's name as his "assistant" in the firm's directory.

41. In July 2006, Cantor hired a male Repo salesperson, Conrad DeVelasco, with the title Director and, upon information and belief, a guaranteed compensation level exceeding two times Ms. Kelly's annual compensation.

42. Upon Mr. DeVelasco's hire, Cantor transferred to him several of Ms. Kelly's accounts, some of which she had covered for almost a decade. Ms. Kelly's contacts at these accounts each expressed their shock and disappointment at the change in coverage, and Ms. Kelly conveyed that feedback to Mr. Kidwell. In response, Mr. Kidwell told Ms. Kelly that he thought at least one of her accounts would be better handled by a male salesperson. He also stated that he would "rather see Conrad with the accounts" and that he was "more comfortable" having Mr. DeVelasco handle the accounts.

43. When Ms. Kelly complained to Mr. Kidwell that a change of coverage based on gender was illegal, he told her that she had "no recourse" and stated that "there are two sets of laws – one for the real world and one for Cantor Fitzgerald."

44. Cantor did not reallocate the accounts of Ms. Kelly's male colleagues with well-established books of business.

45. Following the removal of her long-standing accounts, Ms. Kelly was forced to attempt to rebuild her book of business. The only assistance Cantor provided was to give her names of corporations without leads so she could retrieve information from the internet to cold-call these companies.

46. As a result of the account reallocation, Mr. DeVelasco had the largest book of business on the Repo desk – approximately $19 billion in assets – while Ms. Kelly's portfolio struggled to maintain $4 billion in assets. Prior to the reallocation, Ms. Kelly's portfolio averaged $17 billion in assets. Over 80 percent of Mr. DeVelasco's book of business consisted of accounts removed from Ms. Kelly's book – accounts that she had developed over a long period of time and had brought to Cantor. Those accounts became significantly more valuable when Cantor received Primary Dealer status from the Federal Reserve, which occurred shortly after the accounts were reallocated to Mr. DeVelasco. Cantor was aware for almost two years that Primary Dealer status would catapult Ms. Kelly's book of business further into the billions, yet they chose to take away that opportunity and transfer her long-standing relationships to Mr. DeVelasco.

47. In addition to handling Ms. Kelly's accounts, Mr. DeVelasco began conducting newly-formed business at Cantor known as "BVP" (bonds versus pledge) business. For almost two years prior to Mr. DeVelasco's hire, Ms. Kelly had proposed this business to Mr. Kidwell, only to be told that the firm was not set up for it and had no interest in developing it.

48. In August 2006, Ms. Kelly complained to Human Resources that she was being discriminated and retaliated against on the basis of her gender and age. Ms. Kelly thereafter had several meetings with Cantor's Human Resources and Legal departments in which she described in detail the discriminatory and retaliatory treatment she had suffered.

49. Ms. Kelly was on disability leave during the month of September 2006 due to an unexpected stress-related illness. When she returned to work in early October, she asked for an update on the investigation of her complaints. Ms. Kelly was told that the "investigation" had not evidenced any discrimination or retaliation. When she challenged these findings, Ms. Kelly was told that she was misperceiving events and was too "sensitive." It was also suggested to Ms. Kelly that she had complained as a result of feeling "unappreciated" and not because she had in fact been discriminated and retaliated against.

50. In or around November 2006, Cantor informed Ms. Kelly's largest account – which was also the trading desk's largest account – that its balance would be reduced by nearly 60 percent as a result of Cantor's capital usage restrictions. Upon information and belief, that balance was given to Mr. DeVelasco so that he could build his book of business without using additional firm capital. This sharp decline had a negative impact on Ms. Kelly's relationship with this account. Ms. Kelly's portfolio balances continued to dramatically decline while Mr. DeVelasco enjoyed a steady increase in his business.

51. In 2007, for the third consecutive year, Ms. Kelly did not receive a promotion, while the majority of trading floor professionals and trainees were promoted during Ms. Kelly's tenure. Male and younger female colleagues who had been hired as associates and assistants during 2005 and 2006 had received multiple promotions by 2007.

52. Ms. Kelly continued to follow up with Human Resources for periodic updates concerning her complaints. Cantor repeatedly failed to respond, and no effort was made to take any action toward resolving the issues she had raised.

53. In or around April 2007, Ms. Kelly received an informal performance review from Messrs. Kidwell and Sapio, who told her that she was a hard worker, she knew the products better than anyone on the trading desk, and that she had excellent relationships with her clients. That same day, Ms. Kelly was told that she needed to substantially mark her customers off the market in order to increase profitability and to keep her position at Cantor. Upon information and belief, her male colleagues were not required to act in the same manner. This requirement created an ongoing strain on Ms. Kelly's client relationships.

54. Traders continued to provide unfavorable market rates to Ms. Kelly's clients, whereas they provided favorable rates to the clients of her male and younger female co-workers. Many times Ms. Kelly's customers were not shown rates at all, and the trader would tell Ms. Kelly that he did not have business to do, then that trader would offer the same business to her male and younger female co-workers.

55. Several lending accounts in Ms. Kelly's portfolio remained inactive due to management's capital restrictions. However, the lending accounts that were reallocated from Ms. Kelly's book and given to Mr. DeVelasco were granted approval to build balances, regardless of capital restrictions and less favorable rates. Ms. Kelly was not granted the same approval.

56. On August 9, 2007, Ms. Kelly filed with the Equal Employment Opportunity Commission a Charge of Discrimination against Cantor (the "Charge"), alleging discrimination and retaliation on the basis of her sex, race, national origin and age. A copy of the Charge was provided to Cantor on the same day.

57. Cantor continued to discriminate and retaliate against Ms. Kelly even after receiving the Charge. For example, Cantor continued to provide Ms. Kelly with rates inferior to those given to her male and younger female colleagues for comparable business, causing several of her clients to complain and threaten to pull back business.

58. Additionally, unlike her male colleagues, Ms. Kelly was forbidden to borrow securities. Instead, she was routinely told by the traders that the firm was under capital usage watch.

59. Management continued to decrease Ms. Kelly's book of business despite the better rates she maintained. This was not done for her male and younger female colleagues. When Ms. Kelly protested, her working environment became more intolerable.

60. Jeff Miller, a former colleague, continued his own campaign of humiliation and harassment towards Ms. Kelly, berating her for not picking up the phones, calling her "freak" in front of others and mocking her as she spoke with her customers. Despite alerting her supervisors, as well as Human Resources, of Mr. Miller's behavior, nothing was addressed and the treatment continued.

61. In or around September 2007, Mr. Kidwell said of the annual RMA Securities Lending conference, where most of Ms. Kelly's clients would be in attendance, that he would prefer to send only Mr. DeVelasco, and not Ms. Kelly, because Mr. DeVelasco "would better represent Cantor."

62. Ms. Kelly was not given established accounts from departed salespeople. Instead, most of those accounts were given to Staci Turner, who is ten years Ms. Kelly's junior. When a male colleague decided to move back to London at the end of September, Ms. Turner again received most of his accounts, while Ms. Kelly received none.  When Ms. Kelly questioned Mr. Kidwell, he stated that he preferred that Ms. Turner build her book of business.

63. When Ms. Kelly returned from vacation on September 17, 2007, one of her largest clients informed her that, while Ms. Kelly had been away, Ms. Turner had provided him rates that were comparable to the market.  The client asked for an explanation as to why he was not given the same comparable rates from Ms. Kelly, threatening to pull back business.  Ms. Kelly learned that her trader was showing Ms. Turner rates comparable to those shown to male co-workers, and not the inferior rates routinely given to Ms. Kelly.  When Ms. Kelly brought this to the attention of Mr. Kidwell, she was told that there was no favoritism.  Ms. Kelly showed Mr. Kidwell correspondence comparing the rates the trader provided to her male and younger female colleagues versus the rates that she was given, as well as the dissatisfaction expressed by the client.  Mr. Kidwell then stated, "I don't know how to respond to that," and further stated "We told you that you have to mark your customers."

64. Cantor terminated Ms. Kelly's employment without warning on September 20, 2007. She was the only person on the Repo desk whose employment was terminated.

65. At Ms. Kelly's termination meeting, Mr. Kidwell stated that management had reviewed accounts and current balances, and given the current market turbulence, that day would be her last due to "reduction in staff."

66. At the time of the termination of Ms. Kelly's employment, several of her male and younger female colleagues had lower account balances than she did.

67. Ms. Kelly subsequently asked Mr. Kidwell whether what he had said was the true reason for her termination. Mr. Kidwell replied "Howard does not like to be challenged or threatened." Howard Lutnick is Cantor's Chairman and CEO.

68. Following the termination of Ms. Kelly's employment, the majority of her accounts were assigned to Ms. Turner, who Ms. Kelly trained when Ms. Turner joined the Repo desk.

## FIRST CLAIM

(Sex Discrimination Under the
New York State Human Rights Law)

69. Ms. Kelly repeats and realleges the allegations contained in paragraphs 1 through 68 above as if separately set forth herein.

70. At all relevant times, Ms. Kelly was an "employee" for purposes of § 296 of the New York State Human Rights Law.

71. Cantor is an "employer" for purposes of § 292 of the New York State Human Rights Law.

72. By its actions set forth above, Cantor unlawfully discriminated against Ms. Kelly on the basis of her sex in violation of the New York State Human Rights Law.

73. As a result of Cantor's discrimination, Ms. Kelly has suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial.

## SECOND CLAIM

(Gender Discrimination Under the
New York City Human Rights Law)

74. Ms. Kelly repeats and realleges the allegations contained in paragraphs 1 through 73 above as if separately set forth herein.

75. Ms. Kelly is a "person" under § 8-102(1) of the New York City Human Rights Law.

76. Cantor is an "employer" subject to the provisions of the New York City Human Rights Law under § 8-102(5) of the Administrative Code.

77. By its actions detailed above, Cantor has unlawfully discriminated against Ms. Kelly on the basis of her gender in violation of the New York City Human Rights Law.

78. By reason of the foregoing, Ms. Kelly suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial.

79. Upon information and belief, Cantor's discriminatory conduct was taken with reckless indifference to Ms. Kelly's rights, entitling her to punitive damages under the New York City Human Rights Law.

## THIRD CLAIM

(Retaliation Under the New York State Human Rights Law)

80. Ms. Kelly repeats and realleges the allegations contained in paragraphs 1 though 79 as if separately set forth herein.

81. Ms. Kelly opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under New York State Human Rights Law by asserting to her supervisors, to Human Resources and to the Equal Employment Opportunity Commission that she believed that she was being discriminated against.

82. Defendant retaliated against Ms. Kelly for having engaged in the protected activity described above, including by terminating her employment.

83. Defendant's actions constitute retaliation against Ms. Kelly in violation of the New York State Human Rights Law, § 296.

84. By reason of the foregoing, Ms. Kelly has suffered damages in an amount to be determined at trial.

### FOURTH CLAIM

(Retaliation Under the New York City Human Rights Law)

85. Ms. Kelly repeats and realleges the allegations contained in paragraphs 1 though 84 as if separately set forth herein.

86. Ms. Kelly opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law by asserting to her supervisors, to Human Resources and to the Equal Employment Opportunity Commission that she believed that she was being discriminated against.

87. Defendant retaliated against Ms. Kelly for having engaged in the protected activity described above, including by terminating her employment.

88. Defendant's actions constitute retaliation against Ms. Kelly in violation of the New York City Human Rights Law, § 8-107.

89. By reason of the foregoing, Ms. Kelly has suffered damages, including emotional distress and mental anguish, in an amount to be determined at trial.

90. Upon information and belief, Defendant's retaliatory actions against Ms. Kelly were taken with reckless indifference to Ms. Kelly's rights, entitling her to punitive damages under the New York City Human Rights Law.

## FIFTH CLAIM

(Age Discrimination Under the
New York State Human Rights Law)

91. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 90 as if separately set forth herein.

92. By its actions detailed above, Cantor has unlawfully discriminated against Ms. Kelly on the basis of her age in violation of the New York State Human Rights Law.

93. By reason of the foregoing, Ms. Kelly suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial.

## SIXTH CLAIM

(Age Discrimination Under the
New York City Human Rights Law)

94. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 93 as if separately set forth herein.

95. By its actions detailed above, Cantor has unlawfully discriminated against Ms. Kelly on the basis of her age in violation of the New York City Human Rights Law.

96. By reason of the foregoing, Ms. Kelly suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial.

97. Upon information and belief, Cantor's discriminatory conduct was taken with reckless indifference to Ms. Kelly's rights, entitling her to punitive damages under the New York City Human Rights Law.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A. On her First Claim, back pay in an amount to be determined at trial, front pay in lieu of reinstatement if the court finds it appropriate in equity (otherwise unconditional reinstatement to her prior position), compensatory damages, costs and interest;

B. On her Second Claim, back pay in an amount to be determined at trial, front pay in lieu of reinstatement if the court finds it appropriate in equity (otherwise unconditional reinstatement to her prior position), compensatory damages, punitive damages, attorneys' fees, costs and interest;

C. On her Third Claim, back pay in an amount to be determined at trial, front pay in lieu of reinstatement if the court finds it appropriate in equity (otherwise unconditional reinstatement to her prior position), compensatory damages, costs and interest;

D. On her Fourth Claim, back pay in an amount to be determined at trial, front pay in lieu of reinstatement if the court finds it appropriate in equity (otherwise unconditional reinstatement to her prior position), compensatory damages, punitive damages, attorneys' fees, costs and interest;

F. On her Fifth Claim, back pay in an amount to be determined at trial, front pay in lieu of reinstatement if the court finds it appropriate in equity (otherwise unconditional reinstatement to her prior position), compensatory damages, costs and interest;

G. On her Sixth Claim, back pay in an amount to be determined at trial, front pay in lieu of reinstatement if the court finds it appropriate in equity (otherwise unconditional reinstatement to her prior position), compensatory damages, punitive damages, attorneys' fees, costs and interest; and

H.    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 29, 2008

LIDDLE & ROBINSON, L.L.P.

By: _____
       Christine A. Palmieri (CP 8235)
Attorneys for Plaintiff
800 Third Avenue
New York, New York 10022
(212) 687-8500